**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

HEALTHQUEST OF CENTRAL
JERSEY, LLC, *et al.*,

                Plaintiffs,

        v.

ANTARES AUL SYNDICATE 1274, *et al.*,

                Defendants.

Civil Action No. 18-12375 (MAS) (DEA)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

       This matter comes before the Court upon a series of motions filed by the parties. First is Defendants Antares AUL Syndicate 1274, Liberty Syndicate LIB 4472, Rockhill Insurance Company, and International Insurance Company of Hannover SE's (collectively, "Defendants") Motion to Preclude the Expert Opinion of Kevin Miley, P.E. ("Defendants' Motion to Preclude"). (ECF No. 36.) Plaintiffs Healthquest of Central Jersey, LLC ("Healthquest") and Diamond Nation, LLC ("Diamond Nation") (collectively, "Plaintiffs") opposed (ECF No. 42) and Defendants replied (ECF No. 44). Second is Defendants' Motion for Summary Judgment. (ECF No. 37.) Plaintiffs opposed (ECF No. 40) and Defendants replied (ECF No. 43). Third is Plaintiffs' Motion for Leave to File a Sur-Reply in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Motion to File a Sur-Reply"). (ECF No. 45.) Defendants opposed Plaintiffs' MSJ Sur-Reply Motion (ECF No. 48) to which Plaintiffs did not reply. Last is Plaintiffs' Motion to Strike Defendants' Preclusion Motion Reply or, in the Alternative, for Permission to File a

Sur-Reply in Opposition to Defendants' Preclusion Motion ("Plaintiffs' Motion to Strike"). (ECF No. 46.) Defendants opposed Plaintiffs' Motion to Strike (ECF No. 47) to which Plaintiffs did not reply.

The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below: (1) Defendants' Motion to Preclude is denied; (2) Defendants' Motion for Summary Judgment is granted in part and denied in part; (3) Plaintiffs' Motion to File a Sur-Reply is granted; and (4) Plaintiffs' Motion to Strike is granted in part and denied in part.

## I.   **BACKGROUND**

### A.   **Undisputed Facts**

Healthquest and Diamond Nation are separate entities that operate businesses in Flemington, New Jersey. (Defendants' Statement of Undisputed Material Facts ("DSUMF") ¶¶ 1–3 ECF No. 37-3; Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts ("PRSUMF") ¶¶ 1–3, ECF No. 40-1.) Healthquest operates a health and fitness club, while Diamond Nation operates a sports tournament and training facility. (DSUMF ¶¶ 1–2; PRSUMF ¶¶ 1–2.) "Diamond Nation also owns real property located at 5 Bartles Corner Road, Flemington, New Jersey [], which is home to an outdoor turf baseball field." (DSUMF ¶ 4; PRSUMF ¶ 4.) During the winter months, typically November through April, the baseball field is covered by an air-supported dome structure (the "Original Dome") that is also owned by Diamond Nation. (DSUMF ¶ 5; PRSUMF ¶ 5.) The Original Dome has been solely owned by Diamond Nation since December 2015. (DSUMF ¶ 6; PRSUMF ¶ 6.) Since December 2015, Healthquest "has not generated any revenue" from the Original Dome. (DSUMF ¶ 7; PRSUMF ¶ 7.) During a winter storm in January 2016, the Original Dome failed. (DSUMF ¶ 8; PRSUMF ¶ 8.) Following the

failure of the Original Dome, Diamond Nation had a replacement dome (the "Replacement Dome") constructed. (DSUMF ¶ 9; PRSUMF ¶ 9.) Both the Original Dome and the Replacement Dome were designed by Kevin Miley, P.E. (DSUMF ¶ 11; PRSUMF ¶ 11.) The specifications of the Replacement Dome were identical to those of the Original Dome. (DSUMF ¶ 12; PRSUMF ¶ 12.) The Replacement Dome was "designed to withstand a snow load of 30 pounds per square foot" and wind speeds of up to 120 miles per hour. (DSUMF ¶¶ 13–14; PRSUMF ¶¶ 13–14.)

Defendants issued an insurance policy (the "Policy"), certificate number GEP10459-16, which was effective November 3, 2016 through April 15, 2017. (DSUMF ¶ 15; PRSUMF ¶ 15) (*see also* Policy, Ex. L to Pls.' MSJ Opp'n Br., ECF No. 40-17). The Policy was issued to Healthquest and Diamond Nation. (DSUMF ¶ 15; PRSUMF ¶ 15.) The "Named Insureds" of the Policy are Healthquest and Diamond Nation. (PRSUMF ¶ 40; Defendants' Response to Plaintiffs' Additional Statement of Undisputed Material Facts ("DRASUMF") ¶ 40, ECF No. 43-1.) "The Policy provides coverage for external risks of direct physical loss to the [Replacement] Dome unless the loss is caused by an excluded peril." (DSUMF ¶ 17; PRSUMF ¶ 17.) Specifically, the Policy "excludes coverage for loss caused by collapse, unless the collapse is caused only by one or more of certain specified perils, including [the] weight of ice and snow." (DSUMF ¶ 18; PRSUMF ¶ 18.) The Policy also "excludes coverage for losses that result from an act, error, or omission, whether negligent or not, relating to, *inter alia*, the design construction[,] and specification of [the Replacement Dome]." (DSUMF ¶ 19; PRSUMF ¶ 19.)

On or about March 14, 2017, a winter storm occurred in Flemington, New Jersey, resulting in the accumulation of approximately 19 inches of snow at ground level. (DSUMF ¶¶ 20–21; PRSUMF ¶¶ 20–21.) The 19-inch snowfall equated to a weight of approximately

11 pounds per square foot. (DSUMF ¶ 22; PRSUMF ¶ 22.) The maximum sustained wind speed during the storm was 24 miles per hour, with gusts reaching 40 miles per hour. (DSUMF ¶ 23; PRSUMF ¶ 23.) During the storm, the Replacement Dome failed (the "Loss"). (DSUMF ¶ 24; PRSUMF ¶ 24.) The Loss "did not have any impact on Healthquest's business." (DSUMF ¶ 25; PRSUMF ¶ 25.)

On that same day, Plaintiffs filed a claim with Defendants relating to the Replacement Dome's failure (the "Claim"). (DSUMF ¶ 26; PRSUMF ¶ 26.) Eric Cunningham, P.E., PMP of Madsen, Kneppers & Associates, Inc., inspected the site and the Replacement Dome on March 24, 2017. (DSUMF ¶ 28; PRSUMF ¶ 28.) In his September 1, 2017 report (the "Third MKA Report"), Cunningham "opined that the [Replacement] Dome's fabric membrane tore and the [Replacement] Dome failed under weather conditions that the [Replacement] Dome had been designed to withstand." (DSUMF ¶ 29; PRSUMF ¶ 29) (*see also* Third MKA Report, Ex. H to Pls.' MSJ Opp'n Br., ECF No. 40-13). Cunningham's April 7, 2017 report (the "First MKA Report"), however, does not note any defects in the design of the Replacement Dome. (PRSUMF ¶¶ 29, 42; DRASUMF ¶ 42) (*see also* First MKA Report, Ex. C to Pls.' MSJ Opp'n Br., ECF No. 40-4).

On July 5, 2017, Defendants denied Plaintiffs' Claim "based on the application of the Policy's exclusions for Collapse and Defects, Errors, and Omissions" (the "First Denial"). (DSUMF ¶ 31; PRSUMF ¶ 31) (*see also* First Denial Correspondence, Ex. N to Pls.' MSJ Opp'n Br., ECF No. 40-19). On August 4, 2017, Plaintiffs requested Defendants reconsider their denial of Plaintiffs' Claim or face litigation. (DSUMF ¶ 32; PRSUMF ¶ 32.) On September 15, 2017, Defendants informed Plaintiffs that they "maintained their denial of the Claim" (the "Renewed Denial"). (DSUMF ¶ 36; PRSUMF ¶ 37) (*see also* Renewed Denial Correspondence, Ex. O to

Pls.' MSJ Opp'n Br., ECF No. 40-20). On June 28, 2018, Plaintiffs commenced litigation. (DSUMF ¶ 37; PRSUMF ¶ 38.)

### B. Disputed Facts

#### 1. Plaintiffs' Disputed Facts

The parties dispute numerous issues relevant to the dispute, including the cause of the collapse of the Replacement Dome. Specifically, Plaintiffs dispute Defendants' contention that "although the weather conditions were well within the [Replacement] Dome's specifications, the [Replacement] Dome's fabric membrane suffered a tear, resulting in the [Replacement] Dome's failure." (PRSUMF ¶ 24.) Plaintiffs aver that "[b]ased on photographic evidence, the localized build-up of snow and partially melted snow on the [Replacement] Dome exceeded the design snow load for the building, at or around the apex of the dome shape." (*Id.*) Plaintiffs claim it was this "excessive snow accumulation" that initiated the tear in the Replacement Dome's fabric membrane. (*Id.*) Plaintiffs similarly disagree with Defendants' assertion that "[i]f the [Replacement] Dome had adhered to the manufacturer's specifications, the tear would not have occurred." (*Id.* ¶ 30.) In accordance with their previous objection, Plaintiffs aver that the tear was the result of a "localized build-up of excessive snow on the [Replacement] Dome." (*Id.*)

Plaintiffs also seek to add context to Defendants' assertion that 19 inches of snow accumulated at ground-level during the storm. (*Id.* ¶ 21.) Plaintiffs similarly seek to add context to the assertion that the maximum sustained wind speed was 24 miles per hour, with gusts reaching 40 miles per hour. (*Id.* ¶ 23.) Plaintiffs note that these figures were "derived from reports issued by the [National Operations Hydrologic Remote Sensing Center] and [National Oceanic and Atmospheric Administration] based on satellite data from locations . . . approximately 4.8 [and] 11.6 miles from the [Replacement] Dome . . . and not by personal observation." (*Id.* ¶¶ 21, 23.)

Plaintiffs argue that these figures, therefore, do "not evidence with certainty" the snow accumulation at ground level and wind speeds at the Replacement Dome during the storm. (*Id.* ¶¶ 21, 23.)

Plaintiffs further dispute Defendants' contention that "Cunningham opined that the [Replacement] Dome's fabric membrane tore and the [Replacement] Dome failed under weather conditions that the [Replacement] Dome had been designed to withstand." (*Id.* ¶ 29.) Specifically, Plaintiffs take issue with Defendants' citation to both the First and Third MKA Reports in support of this proposition. (*Id.*) Plaintiffs argue that this assertion is misleading because the First MKA Report did not contain this conclusion, although they admit the Third MKA Report did. (*Id.*)

Plaintiffs also take issue with Defendants' assertion that "Plaintiffs did not offer any new information or contrary expert findings to suggest that Defendants' [First Denial] was incorrect." (*Id.* ¶ 35.) Plaintiffs note that, to the contrary, they disclosed the March 18, 2019 Report of Kevin Miley (the "Miley Report") "as proof that [the First Denial was] incorrect." (*Id.*) (*see also* Miley Report, Ex. E to Pls.' MSJ Opp'n Br., ECF No. 40-6.)

### 2.    Defendants' Disputed Facts

Defendants' dispute several additional material facts that have been asserted by Plaintiffs. First, Defendants dispute Plaintiffs' assertion that "the First MKA Report did not include a determination of the cause of the [c]ollapse [of the Replacement Dome]." (DRASUMF ¶ 41.) Defendants aver that the First MKA Report concluded that the Replacement Dome collapsed after suffering a tear in its fabric membrane which occurred during weather conditions the Replacement Dome was designed to withstand. (*Id.*) Defendants also dispute that the First Denial was based solely on the First MKA Report. (*Id.* ¶ 43.) Defendants similarly dispute Plaintiffs' assertion that the Renewed Denial was solely based on the First MKA Report. (*Id.* ¶ 44.)

### C.     Procedural History

On June 28, 2018, Plaintiffs filed a Complaint against Defendants in the Superior Court of New Jersey, Law Division, Hunterdon County. (Compl., Ex. A to Notice of Removal, ECF No. 1-2.) The Complaint alleged four counts: Count One, for breach of contract (*id.* ¶¶ 25–32); Count Two, for breach of the covenant of good faith and fair dealing, for failure to process the Claim in good faith (*id.* ¶¶ 33–36); Count Three, for breach of the covenant of good faith and fair dealing, for denying coverage in bad faith (*id.* ¶¶ 37–44); and Count Four, seeking a declaratory judgment that Defendants are obligated to provide coverage to Healthquest relating to the collapse of the Replacement Dome (*id.* ¶¶ 45–48).

On August 2, 2018, this matter was removed to this Court. (Notice of Removal, ECF No. 1.) On August 16, 2018, Defendants answered the Complaint. (ECF No. 9.) On September 27, 2018, the Honorable Douglas E. Arpert, U.S.M.J., entered the First Pretrial Scheduling Order. (ECF No. 11.) On December 2, 2019, Defendants filed their Motion to Preclude (Mot. to Preclude, ECF No. 36) and their Motion for Summary Judgment (Mot. for Summ. J., ECF No. 37). On January 3, 2020, Plaintiffs filed their Motion to File a Sur-Reply (Sur-Reply Mot., ECF No. 45) and their Motion to Strike (Mot. to Strike, ECF No. 46).

## II.     PARTIES' POSITIONS

### A.     Plaintiffs' Motion to File a Sur-Reply

Plaintiffs seek to file a sur-reply to Defendants' Reply Brief in support of their Motion for Summary Judgment, pursuant to Local Civil Rule 7.1(d)(6).[1] (Sur-Reply Mot. 1.) Plaintiffs argue that Defendants' Reply "presents a new argument concerning Plaintiffs' bad faith claim;

---

[1] Local Civil Rule 7.1(d)(6) states, "[n]o sur-replies are permitted without permission of the Judge or Magistrate Judge to whom the case is assigned."

specifically, that the bad faith claim cannot succeed because Plaintiffs cannot establish a right to summary judgment on their breach of contract claim." (*Id.*) Plaintiffs further aver that such an argument was not raised in Defendants' Motion for Summary Judgment and, accordingly, Plaintiffs seek permission to file a sur-reply "for the limited purpose of addressing Defendants' new argument." (*Id.* at 1–2.)

In opposition, Defendants contend that their Reply Brief does not warrant a sur-reply because, contrary to Plaintiffs' assertions, it "does not raise any new issues necessitating a response." (Defs.' Sur-Reply Mot. Opp'n Br. 4, ECF No. 48.) Defendants similarly argue that in fact it is Plaintiffs' proposed sur-reply that impermissibly raises new arguments. (*Id.* at 5.)

## B.  Plaintiffs' Motion to Strike

Plaintiffs seek an order striking Defendants' reply brief in support of their Motion to Preclude or, in the alternative, permission to file a sur-reply pursuant to Local Civil Rule 7.1(d)(6). (Mot. to Strike 1.) Plaintiffs argue that Defendants' brief "is inappropriate because it presents, for the first time, new and distinct arguments alleging deficiencies in the methodology used by Kevin Miley in his analysis of the cause of the [Replacement] Dome collapse." (*Id.* at 1–2.)

In opposition, Defendants argue that Plaintiffs' Motion to Strike should be denied because Defendants' reply "properly refutes the allegations and arguments put before the Court" by the Plaintiffs. (Defs.' Mot. to Strike Opp'n Br. 4, ECF No. 47.) Defendants contend that "[t]he only logical motivation for Plaintiffs' [Motion to Strike] is to concoct [s]ome reason to permit them to have the last word." (*Id.* at 5.)

## C.  Defendants' Motion to Preclude

Defendants seek to preclude Plaintiffs from offering the opinion of Kevin Miley, that the failure of the Replacement Dome was solely caused by weather conditions that exceeded the

Replacement Dome's specifications. (Defs.' Preclusion Moving Br. 5, ECF No 36-2.) Defendants aver that "[r]ather than accepting the reliable result of an agreed-upon methodology, Miley abandons the scientific method altogether, opting instead to offer an opinion based on his own personal belief that his opinion is the 'only explanation' for the [Replacement] Dome's failure." (*Id.* at 8.)

Plaintiffs advance several arguments in opposition. First, Plaintiffs argue that Defendants' Motion to Preclude is time-barred because it was filed after the deadline for *Daubert* motions set by Judge Arpert. (Pls.' Preclusion Opp'n Br. 7, ECF No. 42-1.) Second, Plaintiffs contend that Defendants' Preclusion Motion improperly relies on the Third Supplemental Report filed by Cunningham; a report that Judge Arpert struck as untimely. (*Id.*; *see also* Dec. 9, 2019 Order, ECF No. 38). Plaintiffs aver that Defendants' motion is simply a new vehicle through which they seek to advance the same arguments that Judge Arpert ultimately struck. (Pls.' Preclusion Opp'n Br. 7–8.) Finally, Plaintiffs argue that the motion should be denied "because the representations made in the [m]otion concerning Mr. Miley's methodology are untrue." (*Id.* at 8.) Plaintiffs contend that Defendants' motion "ignores [the Miley Report] and falsely represents cherry-picked selections of his deposition testimony as the full compass of his analysis." (*Id.* at 9.)

### D.     Defendants' Motion for Summary Judgment

Defendants contend they are entitled to judgment as a matter of law on Plaintiffs' breach of contract and declaratory judgment claims because the failure of the Replacement Dome is not covered by the Policy. (Defs.' MSJ Moving Br. 6, ECF No. 37-2.) Defendants argue that the collapse of the Replacement Dome was caused by a combination of the weight of the ice and snow and by a design defect. (*Id.* at 6–11.) Because the weight of the ice and snow, a covered peril,

combined with the excluded peril of a manufacturing or design defect, Defendants aver that the Policy does not provide coverage for the collapse. (*Id.* at 11.)

Defendants argue they are similarly entitled to summary judgment on Plaintiffs' bad faith claims because the claims necessarily arise from the Policy, which does not provide coverage for the loss. (*Id.* at 13–14.) Alternatively, Defendants contend they are entitled to summary judgment on the bad faith claims because their decision to deny coverage was "at least, fairly debatable." (*Id.* at 14.) Defendants argue that, because the First Denial and Renewed Denial were supported by Cunningham's expert reports, their decision was reasonable. (*Id.* 15–16.)

Finally, Defendants contend that all of Healthquest's claims should be dismissed because Healthquest does not have an insurable interest in the Replacement Dome and, therefore, has not suffered any damage. (*Id.* at 16.)

Plaintiffs advance multiple arguments in opposition. First, they argue that the collapse of the Replacement Dome was not caused by a design or manufacturing defect, but rather solely by the combined weight of the snow and ice. (Pls.' MSJ Opp'n Br. 9–10, ECF No. 40.) Plaintiffs similarly contend that Defendants have failed to meet their burden of establishing that the collapse was caused by an excluded peril. (*Id.* at 11.) As to their bad faith claims, Plaintiffs aver that "[t]here is ample evidence that [Defendants'] investigation and adjustment of the Claim has been handled in bad faith from the very beginning." (*Id.* at 19.) In particular, Plaintiffs note that when Defendants issued the First Denial, only the First MKA Report was available to them. (*Id.* at 20.) The First MKA Report, according to Plaintiffs, did not identify any design deficiencies, which would be required to deny coverage under the Policy. (*Id.*)

Finally, Plaintiffs argue that Healthquest has an insurable interest in the Replacement Dome and is a proper party to this litigation because the Policy was specifically issued to

"Healthquest of Central Jersey, LLC & Diamond Nation, LLC." (*Id.* at 21; *see also* Policy.) Plaintiffs aver that, because Defendants "explicitly insured Healthquest's interest in the [Replacement] Dome," the argument that Healthquest is not a proper party "is perplexing and at best, creates a genuine issue of material fact that precludes summary judgment on this issue." (*Id.*)

## III.   LEGAL STANDARDS

### A.   Motion to Preclude Expert Testimony

Rule 702 governs the admissibility of testimony by an expert witness. Fed. R. Evid. 702. Pursuant to Rule 702, a witness, who qualifies as an expert, may provide testimony if the expert's scientific, technical, or specialized knowledge will assist the trier of fact and "the testimony is based on sufficient facts or data . . . , [and] testimony is the product of reliable principles and methods . . . , and the expert has reliably applied the principles and methods to the facts of the case." *Id.* The Third Circuit has found "that Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability[,] and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citation omitted). The qualification requirement is interpreted broadly and means that the witness possesses a specialized expertise. *Id.* To be reliable, "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; [and] the expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)). Finally, the expert's opinion must "fit the issues in the case" and help the trier of fact. *Schneider*, 320 F.3d at 404. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92.

"[T]he district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability[,] and fit from reaching the jury." *Schneider*, 320 F.3d at 404 (citation omitted). The party offering the expert testimony bears the burden of establishing the existence of each factor by a preponderance of the evidence. *See In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended by* 199 F.3d 158 (3d Cir. 2000). Rule 702, however, "has a liberal policy of admissibility" which extends to substantive and formal qualifications of experts. *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citation omitted). "If the expert meets [these] liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Id.* at 809.

### B.     Summary Judgment

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To reach this decision, "the Court must determine 'whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine [dispute] of material fact.'" *Lamberson v. Pennsylvania*, 561 F. App'x 201, 206 (3d Cir. 2014) (quoting *Macfarlan v. Ivy Hill SNF, L.L.C.*, 675 F.3d 266, 271 (3d Cir. 2012)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

 "In evaluating the evidence, the Court must consider all facts and their logical inferences in the light most favorable to the non-moving party." *Rhodes v. Marix Servicing, LLC*, 302

F. Supp. 3d 656, 661 (D.N.J. 2018) (citing *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002)). "While the moving party bears the initial burden of proving an absence of a genuine dispute of material fact, meeting this obligation shifts the burden [t]o the non-moving party to 'set forth specific facts showing that there is a genuine [dispute] for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250). "Unsupported allegations, subjective beliefs, or argument alone . . . cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019). "Thus, if the nonmoving party fails 'to make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be no genuine [dispute] of material fact . . . .'" *Id.* (quoting *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quotation marks omitted)). "In considering the motion, the Court 'does not resolve factual disputes or make credibility determinations.'" *Rhodes*, 302 F. Supp. 3d at 661 (quoting *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995)).

## IV.   DISCUSSION

### A.   Plaintiffs' Motion to File a Sur-Reply

The Court first addresses Plaintiffs' Motion to File a Sur-Reply. (Sur-Reply Mot.) Under the Local Civil Rules, "[n]o sur-replies are permitted without permission of the Judge or Magistrate Judge to whom the case is assigned." L. Civ. R. 7.1(d)(6). "[T]he Court typically will not consider sur-replies that parties have filed without seeking and receiving leave to do so." *Norkunas v. S. Pa. Transp. Auth.*, No. 19-627, 2019 WL 6337913, at *2 n.3 (D.N.J. Nov. 27, 2019) (citing *Young v. United States*, 152 F. Supp. 3d 337, 352 (D.N.J. 2015)). "[A] sur-reply is meant only to address new issues raised by the opposing party for the first time in a reply brief. It is not meant to be used as a vehicle for providing the Court with arguments that could have been included in the earlier

opposition brief." *Zahl v. Local 641 Teamsters Welfare Fund*, No. 09-1100, 2010 WL 3724520, at *3 (D.N.J. Sept. 14, 2010) (internal citations and quotations omitted).

Plaintiffs seek permission to file a sur-reply to address Defendants' argument that, under Third Circuit precedent,[2] Plaintiffs' bad faith claims fail as a matter of law because Plaintiffs cannot establish a right to summary judgment on their contract claim. (Sur-Reply Mot. 1.) Plaintiffs contend that this argument was raised for the first time in Defendants' reply brief in support of their Motion for Summary Judgment. (*Id.*) In opposition, Defendants' argue that their brief "point[s] out the lack of a cross-motion for summary judgment, which Defendants only became aware of on . . . the dispositive motion deadline." (Defs.' Sur-Reply Opp'n Br. 4.) In so doing, however, Defendants' acknowledge that their argument was not raised in their initial moving brief and instead was first broached in their reply brief. Because Plaintiffs properly sought this Court's permission under Local Civil Rule 7.1(d)(6), and because the Court finds good cause to consider Plaintiffs' sur-reply, Plaintiffs' Motion to File a Sur-Reply is granted.

### B. Plaintiffs' Motion to Strike

Plaintiffs seek an order striking Defendants' reply brief in support of their Motion to Preclude or, in the alternative, permission to file a sur-reply pursuant to Local Civil Rule 7.1(d)(6). (Mot. to Strike 1.) Plaintiffs aver that the arguments in Defendants' reply brief "are a complete departure" from those contained in their Motion to Preclude because they now "charge that specific elements of [Kevin] Miley's methodology were deficient." (*Id.* at 4.)

Because Plaintiffs properly sought leave of Court to file a sur-reply, in accordance with the Local Rules, the Court grants Plaintiffs' Motion to Strike to the extent Plaintiffs seek to file a

---

[2] Both parties refer to *Ketzner v. John Hancock Mut. Life Ins. Co.*, 118 F. App'x 594 (3d Cir. 2004).

sur-reply. Because the Court permits the filing of a sur-reply, Plaintiffs' request to strike Defendants' reply brief is denied as moot.

### C.   Defendants' Motion to Preclude

Courts in the Third Circuit look to three factors when determining the admissibility of expert testimony: qualification, reliability, and fit. *Schneider*, 320 F.3d at 404. The qualification requirement is interpreted broadly and means that the witness possesses a specialized expertise. *Id.* To be reliable, "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; [and] the expert must have 'good grounds' for his or her belief." *In re Paoli*, 35 F.3d at 742 (quotation omitted). Finally, the expert's opinion must "fit the issues in the case" and help the trier of fact. *Schneider*, 320 F.3d at 404.

Here, there is no question that Miley possesses specialized expertise and, therefore, satisfies the qualification requirement.[3] Miley received a Master's of Science in Engineering from Rutgers University in 1979, obtained a professional license in the state of New York in 1983, and "has provided structural and related civil engineering services for 40 years." (*See* Miley Report *11;[4] *see also* Deposition Transcript of Kevin Miley ("Miley Tr.")[5] 12:19–13:23, Ex. H to Defs.' Mot. for Summ. J., ECF No. 37-4.) Miley has worked on over 200 air-supported structures, like the Replacement Dome, in his career and performs work on air-supported structures several times

---

[3] The Court also notes that Defendants do not appear to dispute Miley's qualifications as an expert. Rather, they limit their Motion to Preclude to arguing that Miley's opinion is unreliable because it is based upon his subjective beliefs rather than methods and procedures of science. (*See generally* Defs.' Preclusion Moving Br.)

[4] Page numbers for exhibits that are preceded by an asterisk reference the page number listed in the ECF header, unless otherwise noted.

[5] The Court notes that Defendants included all of their exhibits in a single attachment. Exhibit H consists of pages *190–233 of ECF No. 37-4.

per year. (Miley Tr. 18:4–7; 23:9–21.) As to the fit requirement, Miley's expert opinion clearly fits the issues of the case because Miley opines as to the cause of the Replacement Dome's collapse. (*See generally* Miley Report.)

The relevant inquiry, therefore, is whether Miley's Report is reliable and "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *In re Paoli*, 35 F.3d at 742. The party offering the expert testimony bears the burden of establishing the existence of each factor by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d at 665. "The Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (citing *Kannankeril*, 128 F.3d at 806); *see also* Fed. R. Evid. 401 (defining "relevant evidence," to mean evidence that "has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence"). "[A]n expert's testimony is admissible so long as the process or technique [as opposed to the conclusion] the expert used in formulating the opinion is reliable." *In re TMI Litig.*, 193 F.3d at 664 (citation omitted) (alteration in original). The Third Circuit has "cautioned that the standard for determining reliability is not that high." *Id.* at 665 (internal quotation and citation omitted). Indeed, "plaintiffs do not 'have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.'" *Id.* (citation omitted). The Court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Ebenhoech v. Koppers Indus., Inc.*, 239 F. Supp. 2d 455, 465–66 (D.N.J. 2002) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "A court must examine the expert's

conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Crowley v. Six Flags Great Adventure*, No. 14-2433, 2017 WL 1836155, at *5 (D.N.J. May 8, 2017) (internal quotation and citation omitted). However, "*Daubert* does not set up a test of which opinion has the best foundation, but rather whether any particular opinion is based on valid reasoning and reliable methodology." <u>Kannankeril</u>, 128 F.3d at 806. "Therefore, if the methodology and reasoning are sufficiently reliable to allow the fact finder to consider the expert's opinion, it is that trier of fact that must assess the expert's conclusions." *In re TMI Litig.*, 193 F.3d at 665.

In his Report, Miley opined that the Loss was the result of a "[l]ocalized build-up of snow and partially melted snow that exceeded the design snow load," that the excessive accumulation lead to a tear in the Replacement Dome's fabric membrane, that the tear was exacerbated by wind gusts during the storm, and that the multiple observed tears were the result of further damage as the Replacement Dome deflated. (Miley Report *8.) Defendants argue Miley's conclusion should be precluded because "[r]ather than accepting the reliable result of an agreed-upon methodology, Miley abandons the scientific method altogether, opting instead to offer an opinion based on his own personal belief that his opinion is the 'only explanation' for the [Replacement] Dome's failure." (Defs.' Preclusion Moving Br. 8.) In support of their argument, Defendants point to an excerpt from Miley's deposition which reads, in relevant part,

> Q: The [Replacement D]ome was designed to handle in-place snow loads of up to 30 pounds per square foot is that accurate?
>
> A: Yes.
>
> Q: Sitting here today you don't know whether the in-place snow load on March 14, 2015 on the [Replacement D]ome was more or less than 30 pounds per square foot?
>
> A: I don't know with certainty but, I believe, it was higher than.

> Q: Okay. Why do you believe it was higher than?
>
> A: I believe it was higher than because that, to me, is the only explanation for the development of the pockets and tearing of the fabric.

(Miley Tr. 90:16–91:8.) Defendants' bald assertion that Miley relies solely on "his personal belief" is a mischaracterization of Miley's opinion and completely disregards the contents of Miley's Report. In his Report, Miley specifically describes how pictures of the Replacement Dome reveal "[t]he presence of lopsided snow accumulation on the surface." (Miley Report *7.) He notes that "[t]he acknowledged . . . winds . . . are certainly sufficient to cause significant movement of [the] accumulated snow." (*Id.*) Miley further explains that "[d]rifted snow is significantly denser (heavier) than the uniform ground snow due to the densification that occurs as the snow piles up. Densification increases with melting of the snow due to the warm dome surface." (*Id.*) Miley then describes the calculations he used to reach the conclusion that the in-place snow load was greater than the surface snow load. (*Id.* at *7–*8.) As discussed above, Miley ultimately concluded that this localized build-up, rather than a structural defect, was responsible for initiating the tear in the Replacement Dome's fabric membrane. (*Id.* at *8.) Given Miley's Report, the Court finds,

therefore, that Plaintiffs have established Miley's reliability by a preponderance of the evidence. Defendants' Motion to Preclude is therefore denied.[6]

### D.     Defendants' Motion for Summary Judgment

### 1.     The Breach of Contract and Declaratory Judgment Claims

Defendants argue they are entitled to judgment as a matter of law on Plaintiffs' breach of contract and declaratory judgment claims because the failure of the Replacement Dome is not covered by the Policy. (Defs.' MSJ Moving Br. 6.)

In New Jersey, "[w]hen interpreting an insurance policy, courts should give the policy's words their plain, ordinary meaning." *Nav-Its, Inc. v. Selective Ins. Co. of Am.*, 869 A.2d 929, 933 (N.J. 2005) (citing *President v. Jenkins,* 853 A.2d 247, 254 (N.J. 2004)) (internal quotation

---

[6] The Court also notes that Defendants' Motion to Preclude was submitted after the filing deadline for *Daubert* motions and, therefore, could also be denied as time-barred. On June 3, 2019, Judge Arpert entered a Scheduling Order stating that "[a]ll *Daubert* and dispositive motions must be filed by September 27, 2019." (ECF No. 19.) On August 20, 2019, the parties filed a joint motion to extend discovery and jointly proposed extending the deadline for all *Daubert* and dispositive motions to November 12, 2019. (ECF No. 25.) On September 13, 2019, Judge Arpert issued a Revised Scheduling Order that extended the dispositive motion deadline to November 12, 2019. (ECF No. 28.) The Revised Scheduling Order did not address the deadline for *Daubert* motions. (*Id.*) On October 4, 2019, Defendants filed a motion requesting, *inter alia*, the deadline for dispositive motions be extended to December 2, 2019. (ECF No. 30.) Defendants' motion did not request an extension to the deadline for filing *Daubert* motions. (*See generally id.*) On October 9, 2019, Judge Arpert granted Defendants' motion and amended the Revised Scheduling Order as requested. (ECF No. 31.) Judge Arpert's October 9, 2019 Order did not mention *Daubert* motions. (*See generally id.*) Defendants' filed their Motion to Preclude on December 2, 2019. On December 9, 2019 Judge Arpert entered an order striking, as time-barred, a third supplemental expert report authored by Cunningham. (Dec. 9, 2019 Order, ECF No. 38.) In the December 9, 2019 Order, Judge Arpert noted that the third supplemental expert report "was served on October 31, 2019 . . . two weeks before the deadline for *Daubert* motions [and] a month before the dispositive motion deadline." (Dec. 9, 2019 Order 1.) In their brief addressing the issue, Defendants aver that they "assumed that the Court either removed the deadline for filing *Daubert* [m]otions, or, based on the Court's [Scheduling Order], the deadline for filing *Daubert* [m]otions followed the dispositive motion deadline." (Defs.' Mot. to Preclude Reply Br. 5, ECF No. 44.) The Court notes, however, that Defendants never sought clarification from the Court regarding these deadlines.

omitted); *see also Ill. Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011). "If the policy language is clear, the policy should be interpreted as written." *Nav-Its, Inc.*, 869 A.2d at 933. Policy exclusions are to be narrowly construed. *Id.* at 934 (citing *Princeton Ins. Co. v. Chunmuang,* 698 A.2d 9, 16 (N.J. 1997)). "Nevertheless, if the exclusion is specific, plain, clear, prominent, and not contrary to public policy, it will be enforced as written." *Id.* (internal citations and quotations omitted). "In situations in which multiple events, one of which is covered, occur sequentially in a chain of causation to produce a loss, we have adopted the approach known as 'Appleman's rule,' pursuant to which the loss is covered if a covered cause starts or ends the sequence of events leading to the loss." *Flomerfelt v. Cardiello*, 997 A.2d 991, 1000 (N.J. 2010).

The Policy "cover[s] external risks of direct physical loss [to the Replacement Dome] unless the loss is limited or caused by a peril that is excluded." (Policy *15.) The Policy excludes coverage for a loss resulting from "an act, error, or omission (negligent or not)" relating to, *inter alia*, "the design, specification, construction, workmanship, installation, or maintenance" of the Replacement Dome. (*Id.* at *17.) Collapse is also an excluded peril under the Policy, unless the collapse is only caused by, *inter alia*, the weight of ice and snow. (*Id.* at *21; *see also* DSUMF ¶ 18; PRSUMF ¶ 18.)

Here, the Court finds that the parties reasonably dispute the cause of the Replacement Dome's failure and, accordingly, there is at least one genuine dispute of material fact between the parties precluding summary judgment. *See Anderson*, 477 U.S. at 248. Defendants argue that the Loss is excluded under the Policy because the tear in the fabric membrane was jointly caused by the weight of ice and snow, a covered peril, and an error relating to the Replacement Dome's design, specification, or installation, an excluded peril. (Defs.' MSJ Moving Br. 7.) Defendants

contend that while the weight of ice and snow "contributed to the tear in the [Replacement] Dome's fabric membrane, [it] was not the *only* cause of the [Replacement] Dome's collapse." (*Id.* at 11 (emphasis in original).)

Plaintiffs, on the other hand, argue that the Loss was caused solely by the weight of a localized build-up of ice and snow. (Pls.' MSJ Opp'n Br. 7.) Indeed, in his Report, Miley opined that the "[l]ocalized build-up of snow and partially melted snow [] exceeded the design snow load," that the excessive accumulation lead to a tear in the Replacement Dome's fabric membrane, that the tear was exacerbated by wind gusts during the storm, and that the multiple observed tears were the result of further damage as the Replacement Dome deflated. (Miley Report *8.)

After carefully considering the record before it, the Court finds that at least one genuine dispute of material fact exists. *See Assurance Co. of Am. v. Jay-Mar, Inc.*, 38 F. Supp. 2d 349, 355 (D.N.J. 1999) (denying insurer's motion for summary judgment where "[t]he discrepancy between [] expert reports" as to whether a loss was caused by a covered or excluded peril "creates a genuine issue of material fact which must be decided by the factfinder in this case"). Defendants' Motion for Summary Judgment, as to the breach of contract and declaratory judgment claims, is therefore denied.

### 2.      The Bad Faith Claims

Defendants advance two principal arguments in support of their contention that Plaintiffs' bad faith claims should be dismissed. First, Defendants aver that because the Policy does not cover the Loss, Defendants did not breach the Policy by denying Plaintiffs' claim and, therefore, Plaintiffs' bad faith claims fail as a matter of law. (Defs.' MSJ Moving Br. 13.) Because the Court finds there is a genuine dispute over the cause of the Loss and, therefore, whether Plaintiffs are

entitled to recover under the Policy, the Court finds that this argument fails to establish Defendants' right to judgment as a matter of law at this stage.

Alternatively, Defendants argue they are entitled to judgment on Plaintiffs' bad faith claims "because Defendants['] coverage decision [was], at least, fairly debatable." (*Id.* at 14.) In opposition, Plaintiffs argue that "[t]here is ample evidence that [Defendants'] investigation and adjustment of the [c]laim has been handled in bad faith from the very beginning." (Pls.' MSJ Opp'n Br. 19.) Plaintiffs take issue with Cunningham's investigation of the site of the Loss and his failure, *inter alia*, to "perform any destructive testing of the fabric membrane, cables, concrete . . . or other portion of the [Replacement] Dome." (*Id.* at 19–20.) Plaintiffs further contend that the First Denial was supported only by the First MKA Report which, according to Plaintiffs, "did not identify a cause of [L]oss or any design deficiencies." (*Id.* at 20; *see also* Pls.' MSJ Sur-Reply Br. 1–2, ECF No. 45.) Plaintiffs aver that, accordingly, Defendants "had no support whatsoever for its conclusion that there was an error with the [Replacement] Dome's" design or specifications and that Defendants "fabricated a basis for the denial of coverage." (Pls.' MSJ Sur-Reply Br. at 2.)

"New Jersey law establishes a general duty of good faith and fair dealing in every contract as well as duties specific to insurers." *Andrews v. Merchs. Mut. Ins. Co.*, 718 F. App'x 135, 140 (3d Cir. 2018). Indeed, "an insurance company owes a duty of good faith to its insured in processing a first-party claim." *Pickett v. Lloyd's*, 621 A.2d 445, 450 (N.J. 1993). "Under New Jersey law, to establish a claim for bad faith in the insurance context, a plaintiff must show two elements: (1) the insurer lacked a 'fairly debatable' reason for its failure to pay a claim, and (2) the insurer knew or recklessly disregarded the lack of a reasonable basis for denying the claim." *Ketzner*, 118 F. App'x at 599 (citing *Pickett*, 621 A.2d at 454). "A claimant who cannot establish a right to summary judgment on the substantive claim that the policy was breached, however,

cannot prevail on a claim for an insurer's alleged bad faith refusal to pay the claim." *Andrews*, 718 F. App'x at 140. "In other words, if there are material issues of disputed fact which would preclude summary judgment as a matter of law, an insured cannot maintain a cause of action for bad faith." *Ketzner*, 118 F. App'x at 599.

Plaintiffs acknowledge the New Jersey Supreme Court and Third Circuit precedent on this issue, but urge the Court to depart from such precedent because "this case is distinguishable because the denial was not 'fairly debatable' when the [First Denial] was issued; it was flat out wrong, and [Defendants'] knew it." (Pls.' MSJ Sur-Reply Br. 4.) The Court, however, declines to depart from the well-established precedent. First, Plaintiffs have not filed a cross-motion for summary judgment. The case law is clear that a plaintiff who cannot establish a right to summary judgment cannot prevail on a bad faith claim. Second, although the First MKA Report does not explicitly state that the Loss was caused by a deficiency in the Replacement Dome's design or specifications, it does note that the Replacement Dome collapsed under weather conditions it was designed to withstand. (First MKA Report *6.) The First MKA Report further concluded that "[t]he design of the structure did not allow the steel cables to prevent the propagation of a tear resulting in a large opening near the center of the structure, a critical loss of pressure, and subsequently the rapid collapse of the structure." (*Id.* at *7.) Moreover, despite Plaintiffs contention that they "could prove that [Defendants'] denial of coverage was not 'fairly debatable' with one hand tied behind their backs," (Pls.' MSJ Sur-Reply Br. 2), they fail to point to even a single case where a court has departed from or distinguished the *Pickett* standard. (*See generally id.*) Because Plaintiffs cannot establish a right to summary judgment as to their underlying breach of contract claim, Defendants' Motion for Summary Judgment, as to Plaintiffs' bad faith claims, is granted. *See, e.g.*, *Hudson Universal, Ltd. v. Aetna Ins. Co.*, 987 F. Supp. 337, 341 (D.N.J. 1997)

(that "an insurer's disclaimer of coverage cannot be held to be in bad faith unless the insured is granted summary judgment on the issue of coverage"); *Tarsio v. Provident Ins. Co.*, 108 F. Supp. 2d 397, 401 (D.N.J. 2000) ("If factual issues exist as to the underlying claim (i.e., questions of fact as to whether plaintiff is entitled to insurance benefits—plaintiff's first cause of action), the Court must dismiss plaintiff's second cause of action—the 'bad faith' claim."); *Polizzi Meats, Inc. v. Aetna Life & Cas. Co.*, 931 F. Supp. 328, 334–35, 339–41 (D.N.J. 1996) (same). Counts Two and Three of the Complaint are dismissed with prejudice.

### 3.    Healthquest's Claims

Finally, Defendants seek dismissal of Healthquest's claims relating to the Loss on the grounds that Healthquest lacks an insurable interest in the Replacement Dome and, therefore, Defendants are entitled to judgment as a matter of law in their favor on all of Healthquest's claims. (Defs.' MSJ Moving Br. 16.) Defendants point to language from the Policy which states, "'[w]e' do not cover more than 'your' insurable interest in any property." (Policy *23.) Because Healthquest "has not derived a pecuniary benefit from the Dome since December 2015," Defendants contend they do not have an insurable interest in the Replacement Dome. (Defs.' MSJ Moving Br. 16.)

In support, Defendants point to *Miller v. New Jersey Insurance Underwriting Association*, 414 A.2d 1322 (N.J. 1980), and argue that it stood for the broad proposition that "an insurable interest [is] any reasonable expectation of deriving pecuniary benefit from the preservation of the property or direct pecuniary loss from its destruction." (Defs. MSJ Moving Br. 16 (citing *Miller*, 414 A.2d at 1325).) The court in *Miller*, however, was not as reductive as Defendants imply. Rather, the court noted that "[w]hat constitutes an insurable interest is a subject which has received a great deal of judicial consideration, and which some text writers say is incapable of exact

definition. The problem of defining an insurable interest continues and is the central issue in this case." *Miller*, 414 A.2d at 1325. In remanding the case for trial consistent with its opinion, the court noted that the "[p]laintiffs are entitled to present proof of the value of their interests at a plenary hearing." *Id.* at 1326. More recently, the New Jersey Superior Court, Appellate Division expounded on this concept by holding that "[t]he test of an insurable interest in real property is "whether the insured has such a right, title or interest therein, or relation thereto, that he will be *benefited by its preservation and continued existence or suffer a direct pecuniary loss* from its destruction or injury by the peril insured against." *Arthur Andersen LLP v. Fed. Ins. Co.*, 3 A.3d 1279, 1289 (N.J. Super. Ct. App. Div. 2010) (quotation omitted) (emphasis in original).

Here, the Court notes that both Healthquest and Diamond Nation are clearly named as the "assured" on the Policy. (Policy *3.) Further, the Policy is effective from November 3, 2016 through April 15, 2017—a period that commences after Healthquest ceased to derive direct pecuniary benefit from the domes. (*Id.*) Drawing all inferences in the Plaintiffs favor, the Court finds that there is a genuine dispute of material fact as to whether Healthquest has an insurable interest in the Replacement Dome, such that they could be entitled to recover under the Policy. Defendants' Motion for Summary Judgment, to the extent they seek dismissal of Healthquest's claims, is accordingly denied.

## V.    <u>CONCLUSION</u>

For the reasons set forth above: (1) Defendants' Motion to Preclude is denied; (2) Defendants' Motion for Summary Judgment is granted in part and denied in part; (3) Plaintiffs' Motion to File a Sur-Reply is granted; and (4) Plaintiffs' Motion to Strike is granted in part and denied in part. The Court will enter an Order consistent with this Memorandum Opinion.


                                                   s/ Michael A. Shipp
                                                   MICHAEL A. SHIPP
                                                   UNITED STATES DISTRICT JUDGE


<u>Dated</u>: July 31, 2020